# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SCHUYLER FILE,**
      **Plaintiff,**

  v.                                                                              **Case No. 19-C-1063**

**JILL M. KASTNER, et al.,**
      **Defendants.**

---

## DECISION AND ORDER

Plaintiff Schuyler File, an attorney admitted to practice in Wisconsin, brings this suit under 42 U.S.C. § 1983 against the president and executive director of the State Bar of Wisconsin and the chief justice and justices of the Wisconsin Supreme Court. He alleges that the state's requirement that he be a member of the State Bar of Wisconsin violates his rights under the Constitution's First Amendment. The defendants have moved to dismiss his complaint, and I address their motions in a separate order. In the present order, I address the plaintiff's motion arguing that I must disqualify myself under 28 U.S.C. § 455(a).

## I. BACKGROUND

The plaintiff alleges that the State Bar of Wisconsin is unconstitutional in its current form because it compels lawyers to support the State Bar's expressive activities, in violation of the First Amendment. In *Lathrop v. Donohue*, 367 U.S. 820 (1961) and *Keller v. State Bar of California*, 496 U.S. 1 (1990), the Supreme Court addressed similar allegations. Under the holding of those cases, mandatory bar membership is constitutional provided that mandatory dues payments are used to fund only activities that are germane to "regulating the legal profession and improving the quality of legal

services." *See Keller*, 496 U.S. at 13–14. Mandatory dues payments cannot be used to "fund activities of an ideological nature which fall outside of those areas of activity." *Id.* at 14. In *Keller*, the Court relied on *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), in which the Court upheld mandatory dues payments to public-sector unions provided that the dues payments were not used for ideological activities not germane to collective bargaining. However, in *Janus v. American Federation of State, County & Municipal Employees*, the Supreme Court overruled *Abood* and held that public-sector unions can never collect dues from nonmembers who do not wish to pay. The plaintiff argues that because *Abood* has been overruled, *Keller* is no longer good law, and therefore mandatory bar dues must be deemed unconstitutional.

The plaintiff's motion to disqualify centers on a law review article I authored that, among other things, criticizes *Janus* and predicts that it will have effects that I regarded as undesirable. *See* Lynn Adelman, *The Roberts Court's Assault on Democracy*, 14 Harv. L. & Pol'y Rev. 131, 151–52 (2019). The article is not about *Janus* in particular. Instead, it argues that economic and political developments in recent decades have eroded America's democratic institutions and that the decisions of the Roberts Court have contributed to this phenomenon. My discussion of *Janus* appears in a section of the article in which I argue that the decisions of the Roberts Court "consistently augment the power of corporations and the wealthy and reduce that of ordinary Americans" and that this imbalance in power weakens American democracy. *Id.* at 148. In this section, I cite a paper which I contend makes clear that "unions played a major role in reducing income inequality in the middle decades of the twentieth century and that their decline since the

2

1960s contributed significantly to the widening gap between rich and poor." *Id.* at 151. After making this point, I write the following paragraph:

> Thus, a Supreme Court interested in strengthening American democracy might consider the wisdom of further weakening the labor movement. Sadly, this is not the Roberts Court's approach. Consider its 2018 decision in *Janus v. American Federation of State, County and Municipal Employees*, in which the five conservatives overturned a forty-year-old precedent by eliminating a public-sector union's ability to collect a "fair share" or "agency" fee from workers who choose not to become union members but who are still protected by collective bargaining agreements negotiated by the union. As a result of *Janus*, public sector employees around the nation will no longer have to pay such fees even though the union obtains benefits for them. A recent study estimates that the decision could reduce public employee union membership by 8 percent or over 700,000 members. Losses in membership will cause unions to lose revenue, and with less money they will hire fewer representatives, take fewer cases to arbitration, and organize fewer members than they once did. This will likely mean lower pay and benefits for public-sector employees.

*Id.* at 151–52 (footnotes omitted).

The plaintiff notes that *Janus* is the cornerstone of his claim and contends that a reasonable person who reads my article could question my ability to be impartial in this case. However, the plaintiff's motion is not based exclusively on my statements about *Janus*. The plaintiff also describes the article as a "vituperative screed against the Supreme Court majority that decided [*Janus*]" and contends that its overall tone suggests that I could not be impartial in this case. Br. in Supp. at 12, ECF No. 30. The plaintiff further notes that the article is critical of "right wing political and legal organizations." *See* Adelman, *supra*, at 135. The plaintiff states that his counsel, Liberty Justice Center, has been described as a right wing legal organization. He contends that a reasonable observer might think that I am biased against his counsel in a way that would affect the outcome of this case. Finally, the plaintiff contends that my statements to the media about

3

the article and the controversy it generated provide additional reasons to remove myself from this case. For all these reasons, he contends, I am disqualified from hearing the matter under 28 U.S.C. § 455(a).

## II. DISCUSSION

Section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In evaluating whether my impartiality might reasonably be questioned, I conduct the inquiry "'from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and circumstances.*'" *In re Sherwin-Williams Co.*, 607 F.3d 474, 477 (7th Cir. 2010) (quoting *Cheney v. U. S. Dist. Court*, 541 U.S. 913, 924 (2004) (Scalia, J., in chambers)). "That an unreasonable person, focusing on only one aspect of the story, might perceive a risk of bias is irrelevant." *Id.* Moreover, "a reasonable person is a 'thoughtful observer rather than . . . a hypersensitive or unduly suspicious person.'" *Id.* at 478 (quoting *In re Mason*, 916 F.2d 384, 386 (7th Cir.1990)). "Finally, a reasonable person is able to appreciate the significance of the facts in light of relevant legal standards and judicial practice and can discern whether any appearance of impropriety is merely an illusion." *Id.*

The plaintiff's primary contention is that because I made statements critical of *Janus*, and because *Janus* is the focus of his claim, my ability to decide this case impartially may reasonably be questioned. Importantly, however, a judge's having expressed views on a legal subject is not grounds for disqualification. *See Southern Pac. Commc'ns Co. v. American Tel. and Tel. Co.*, 740 F.2d 980, 990 (D.C. Cir. 1984) ("It is well established that the mere fact that a judge holds views on law or policy relevant to

4

the decision of a case does not disqualify him from hearing the case."); *Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1171 n.52 (D.C. Cir. 1979) ("[J]udges are free to decide cases involving policy questions on which they previously have expressed a view."); *United States v. Bray*, 546 F.2d 851, 857 (10th Cir. 1976) ("The mere fact that a judge has previously expressed himself on a particular point of law is not sufficient to show personal bias or prejudice."); *see also Laird v. Tatum*, 408 U.S. 1 (1972) (Rehnquist, J., in chambers) (Supreme Court Justice not disqualified from hearing case involving a matter about which, as an attorney, he expressed a view); *Phillip v. ANR Freight Sys., Inc.*, 945 F.2d 1054 (8th Cir. 1991) ("recusal is not required where 'the judge has definite views as to the law of a particular case.'"); *Leaman v. Ohio Dep't of Mental Retardation & Dev.*, 825 F.2d 946, 949 n.1 (6th Cir. 1987) (judge's prior expression of an opinion on a point of law is not disqualifying). Therefore, the mere fact that I criticized *Janus* is not grounds for disqualification.

The plaintiff suggests that I expressed my views on *Janus* so strongly that this case is unusual and requires disqualification. According to the plaintiff, I "savage[d]" the *Janus* decision in my article. Br. in Supp. at 9. But I do not think that a reasonable observer could share the plaintiff's view. My entire discussion of the merits of the case consisted of one sentence in which I described the holding of the case and noted that the conservative majority overturned a forty-year-old precedent. Adelman, *supra*, at 151–52. The bulk of my commentary on *Janus* was focused not on its merits, but on the effect I predicted it would have on organized labor and economic equality. None of this could reasonably be described as "savaging" the decision.

5

In any event, the cases do not hold that a judge may express his views on the law only if he does so tepidly. The plaintiff cites several cases in support of his assertion that "there are times when a judge's extrajudicial statements on a particular issue are so strong that a reasonable observer would question the judge's impartiality in a case." Br. in Supp. at 8. But none of those cases involved a judge's statement about a point of law in a speech or article. Instead, they each involved a judge who made statements that a reasonable observer might consider applicable to a case that was either pending or about to be pending before him or her. *See Ligon v. City of New York*, 736 F.3d 118, 126–27 (2d Cir. 2013); *United States v. Microsoft Corp.*, 253 F.3d 34, 112 (D.C. Cir. 2001); *In re Boston's Children First*, 244 F.3d 164, 171 (1st Cir. 2001); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993); *Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 97–98 (3d Cir. 1992). *See also In re Sherwin-Williams Co.*, 607 F.3d at 478–79 (distinguishing *Microsoft*, *Boston's Children First,* and *Cooley* on grounds that, in those cases, the judge's comments involved a pending case). A judge's statements about a pending case fall into a different category than a judge's statements about a general point of law in a speech or article. The Code of Conduct for United States Judges proscribes public comment about the merits of a pending case, *see* Canon 3A(6), but it does not proscribe comments about a general point of law in a scholarly presentation. *See In re Sherwin-Williams Co.*, 607 F.3d at 479. Thus, cases that involve a judge's statements about a pending case do not control the analysis here.

The plaintiff contends that my comments "reflect a predisposition against plaintiffs pressing claims based on *Janus*." Br. in Supp. at 8. However, it is not reasonable to think that a judge would be biased against a party because the party's claim relies on a case

6

the judge previously criticized. A judge may disagree with binding precedent and still be expected to properly apply that precedent to the cases that come before him or her. Otherwise, a judge could never express a view about a point of law in a scholarly presentation. Indeed, if criticizing relevant precedent were grounds for recusal, then an appellate judge would be disqualified from any case in which a party relies on a prior case in which the judge wrote a scathing dissent. But as I have explained, it is well-established that a judge is not disqualified from a case merely because he or she has previously expressed a view on the relevant law.

A stronger argument might be that because my article laments the effect of *Janus* on organized labor, a reasonable observer might question if I could be impartial in a case asking that I extend *Janus* in a way that would cause further harm to organized labor. The present case does not involve organized labor, and thus the plaintiff cannot make that argument here. Moreover, I have never expressed a view on the merits of the plaintiff's claim or on the desirability of mandatory state bar membership, either in my article or elsewhere. Thus, a reasonable observer would not believe that my comments on *Janus* reflect a predisposition against a plaintiff challenging the constitutionality of mandatory state bar membership. For this reason, among others, the plaintiff's reliance on *Hathcock v. Navistar International Transportation Corporation*, 53 F.3d 36, 41 (4th Cir. 1995), is misplaced. In that case, a district judge made statements at a torts seminar that were highly critical of defendants in products liability cases. He called such defendants "sons of bitches" and praised cases that he believed would frighten lawyers who represent products liability defendants. *Id.* at 39. At the time he made these statements, the judge was presiding over a jury trial involving a products liability defendant. The Fourth Circuit

7

held that the judge's statements, when viewed alongside his other conduct (such as engaging in *ex parte* communications with plaintiff's counsel), created an appearance of bias against "product liability defendants" that required his recusal from the trial. *Id.* at 41. Unlike the judge in *Hathcock*, I did not make statements indicating bias against a type of litigant, such as "product liability defendants," while a case involving that type of litigant was pending. I certainly did not make statements indicating bias against plaintiffs challenging mandatory state bar membership. Thus, *Hathcock* does not support the plaintiff's disqualification motion.

The plaintiff also suggests that because I concluded my article by noting that it will take "democratic resourcefulness" to "undo the damage that the Court has already caused," Adelman, *supra*, at 158, a reasonable observer might think that I would undercut *Janus* by giving it an artificially narrow reading. But a reasonable observer could not understand this sentence as a call for lower-court judges to purposefully misapply Supreme Court precedent. The article speaks of *democratic* resourcefulness, which a well-informed observer would understand to be a reference to the political process, not the courts, which are generally regarded as undemocratic institutions. *See, e.g., Am. Fed'n of Labor v. Am. Sash & Door Co.*, 335 U.S. 538, (1949) (Frankfurter, J., concurring) (describing the federal courts as "the non-democratic organ of our Government").

Next, the plaintiff contends that the overall tone of the article supports disqualification. Here, the plaintiff describes the article as a "vituperative screed against the Supreme Court majority which decided [*Janus*]." Br. in Supp. at 12. Even if this characterization is accurate, however, it does not suggest that the public might reasonably question my impartiality in this case. My screed, as it were, was directed

8

towards Supreme Court Justices, not towards the plaintiff or his claim. In support of his argument, the plaintiff cites two cases from the Eighth Circuit, which state: "It is one thing for a district judge to disagree on a legal basis with a judgment of this court. It is quite another to openly challenge the court's ruling and attempt to discredit the integrity of the judgment in the eyes of the public." *Moran v. Clarke*, 309 F.3d 516, 518 (8th Cir. 2002); *Reserve Mining Co. v. Lord*, 529 F.2d 181, 188 (8th Cir. 1976). But neither of those cases involved a motion to disqualify a judge based on extrajudicial statements he made about the court's ruling. Instead, in each case, an appellate court remanded a matter to the district judge, and on remand the district judge either made inflammatory statements about the appellate court, *see Moran*, 309 F.3d at 517–18, or acted in defiance of the court's mandate, *see Reserve Mining*, 529 F.2d at 188. These cases do not suggest that a judge's comments about other judges in a law review article are grounds for disqualifying the judge from a pending case.

The plaintiff also notes that my statements in the article have "prompted substantial controversy and [have] led one ethics expert to predict misconduct charges." Br. in Supp. at 13–14. But whether those statements rise to the level of judicial misconduct is a separate matter from whether the public could reasonably question my ability to decide this case impartiality. *See In re Boston's Children First*, 244 F.3d at 168 ("[B]oth this Court and other courts have indicated that the Code of Judicial Conduct does not overlap perfectly with § 455(a): it is possible to violate the Code without creating an appearance of partiality; likewise, it is possible for a judge to comply with the Code yet still be required to recuse herself."). My comments are controversial and have caused some to predict misconduct charges not because they express bias against plaintiffs who challenge

9

mandatory state bar membership, but because they could be perceived as partisan and because they criticize sitting Supreme Court Justices. Thus, even if the statements rise to the level of misconduct, they would not be grounds for disqualification here.

Next, the plaintiff observes that my article is critical of "right wing political and legal organizations." Adelman, *supra*, at 135. He contends that such criticism raises questions about my ability to decide this case impartially because his counsel, Liberty Justice Center, has been described as a right wing legal organization. The comments at issue appear in a segment of the article in which I discuss the rise of economic inequality in the United States over recent decades. In the course of that discussion, I write that, in the 1970s, "conservative activists began to create and fund right wing political and legal organizations and to advance an economic vision of the Constitution that sought to overturn the New Deal consensus." *Id.* I continued:

> Conservatives raised large sums of money and fought legislation favorable to labor unions, working people, and the poor. They also developed an aggressive litigation strategy regarding a variety of constitutional and economic issues and sought to undermine previous Supreme Court decisions authorizing broad Congressional regulation of commerce and promoting equal citizenship.
>
> Over the years, the success of the business groups, trade associations, and right wing advocacy groups in raising money was such that a large imbalance in wealth and organizational resources developed between conservatives who sought to influence government policy and their liberal counterparts. The conservatives also had considerable success from a policy standpoint, and government became increasingly responsive to a relatively small number of individuals and corporations and increasingly unresponsive to the majority of Americans.

*Id.* (footnotes omitted). Much later in the article, in my concluding remarks, I again mention "conservative advocacy groups." *Id.* at 157. There, I write:

> The foundation on which the Constitution was built, the existence of a strong middle class and the absence of extreme wealth and poverty, has

10

substantially eroded. Further, corporations, the wealthy, and those who represent them, adhering to the advice expressed in the Powell memorandum, which has been advanced more recently by a panoply of conservative advocacy groups, refuse to support policies that promote the common good such as Social Security, broad health insurance coverage, and campaign finance reform. Rather, they use their resources to combat these types of policies and promote policies that benefit only themselves. And they have achieved considerable success in this selfish endeavor. We are thus in a new and arguably dangerous phase in American history. Democracy is inherently fragile, and it is even more so when government eschews policies that benefit all classes of Americans. We desperately need public officials who will work to revitalize our democratic republic. Unfortunately, the conservative Justices on the Roberts Court are not among them. It will definitely take every bit of democratic resourcefulness that we can muster to undo the damage that the Court has already caused.

*Id.* at 157–58 (footnotes omitted).

The plaintiff contends that my comments show "substantial hostility" towards conservative legal organizations like his counsel. Br. in Supp. at 17. I do not believe that my comments could reasonably be perceived as such. In the above passages, I primarily express my belief that wealthy individuals and institutions have pursued policy goals that are at odds with a robust democracy. Although this is a negative opinion, it is not substantially hostile. Moreover, to be impartial, a judge does not have to approve of all the policies pursued by a litigant or his counsel; a judge is permitted to have "a less than high opinion" of a party's activities. *United States v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980). For a judge's personal opinion of a party or counsel to be grounds for disqualification, it must involve "an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes." *Id.* "It is an animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct, unless the attitude is somehow related also to a suspect or invidious motive such as racial bias

11

or a dangerous link such as a financial interest . . . ." *Id. See also Liteky v. United States*, 510 U.S. 540, 551 (1994) (for bias to be disqualifying, it must be "so extreme as to display clear inability to render fair judgment"); *Grove Fresh Distribs., Inc. v. John Labatt, Ltd.*, 299 F.3d 635, 640 (7th Cir. 2002) ("The bias or prejudice 'must be grounded in some personal animus or malice that the judge harbors . . . of a kind that a fair-minded person could not entirely set aside when judging certain persons or causes.'"). Here, my comments about the wealthy, large corporations, and conservative legal organizations do not give rise to a reasonable inference that I could not set aside my personal views when presiding over cases involving them.

Next, the plaintiff contends that comments I made to the press about the article "push toward a disqualification determination." Br. in Supp. at 17. Importantly, however, none of my comments to the press related to this case or to any pending case. Rather, I answered questions about whether it was appropriate for a sitting judge to publish a law review article critical of the Supreme Court and conservatives. Although the plaintiff is correct to note that comments to the press may result in disqualification, the cases he cites all involve instances in which judges made comments to the press about their pending cases. *See White v. Nat'l Football League*, 585 F.3d 1129, 1138–39 (8th Cir. 2009); *Ligon*, 736 F.3d at 127; *Microsoft Corp.*, 253 F.3d at 114–16; *In re Boston's Children First*, 244 F.3d at 167–68. The plaintiff has not cited, and I have not found, a case suggesting that a judge is disqualified from a case based on statements he made to the press about matters unrelated to that case. The plaintiff points to language in cases such as *White* and *Microsoft* indicating that a judge should avoid participating in news stories to prevent an appearance that the judge covets publicity and might decide cases

12

in a way that maximizes publicity. But again, the statements to the press in those cases involved pending litigation. The cases do not suggest that a judge's statements to the media about his scholarship could lead to a reasonable inference that he covets publicity and therefore should be presumed to decide all his cases in a way that maximizes publicity. Indeed, in *White*, despite admonishing the judge for creating the appearance that he coveted publicity, the Eighth Circuit concluded that he was not required to recuse himself from the case to which his comments related. 585 F.3d at 1140. For these reasons, my comments to the media about the article do not weigh in favor of disqualification.

In sum, neither my article nor the surrounding media coverage require my recusal from this matter. Therefore, the plaintiff's motion for disqualification will be denied.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiff's motion for disqualification is **DENIED**.

Dated at Milwaukee, Wisconsin, this 29th day of June, 2020.

        s/Lynn Adelman_____
        LYNN ADELMAN
        United States District Judge